UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at FRANKFORT

CIVIL ACTION NO. 3:03-52-KKC

CHAZ CONCRETE CO., LLC, GRANT TRUCKING, INC.,
SWEENEY ENTERPRISES, INC. d/b/a
KENTUCKY TRANSFER LINE, and GREEN
RIVER SEED AND SOD, INC.,                                    PLAINTIFFS,

v.                              **OPINION AND ORDER**

JAMES C. CODELL, III,
and J.M. YOWELL,                                             DEFENDANTS.

**** **** ****

This matter is before the Court on the Defendants' Motions for Summary Judgment (Rec.

Nos. 140 & 141).  For the following reasons, the Court will GRANT the motions.

**I.      FACTS.**

**A.      The Defendants.**

As a result of prior opinions by this court and the Sixth Circuit in *Chaz Construction, LLC*

*v. Codell*, 137 Fed. Appx. 735 (6th Cir. 2005), the sole claims remaining in this case are the

Plaintiffs' claims against the Defendants James C. Codell III ("Codell") and J.M. Yowell ("Yowell")

in their individual capacities. Plaintiffs assert that the individual Defendants violated the Racketeer

Influence and Corrupt Organizations Act ("RICO") , 18 U.S.C. § 1961, *et seq.,* and conspired to

violate RICO by operating the Kentucky Transportation Cabinet (the "Cabinet") as an enterprise to

commit fraud in the awarding of contracts under the Disadvantage Business Enterprise ("DBE")

program. (Rec. No. 36, Amended Complaint ¶ 1).

Codell was the Secretary of the Cabinet from 1996 to 2003. (Rec. No. 36, Amended

Complaint ¶ 8; Rec. No. 141, Mot. for Summ. J. at 3). Yowell was the Cabinet's State Highway

Engineer from 1992 to 2004.  (Rec. No. 36, Amended Complaint ¶ 9; Rec. No. 141, Mot. for Summ. J. at 3).

    **B.**    **The Plaintiffs and the DBE Program.**

Plaintiffs are Chaz Concrete Co., L.L.C. ("Chaz"), Grant Trucking, Inc. ("Grant Trucking"), Sweeney Enterprises, Inc. d/b/a Kentucky Transfer Line ("Kentucky Transfer") and Green River Seed and Sod, Inc. ("Green River").  Each of the Plaintiffs was or is certified by the Cabinet as a DBE (Rec. No. 159, Response to Mot. for Summ. J. at 4). A DBE is a small business which is at least 51-percent owned and managed by individuals who are both socially and economically disadvantaged. (Rec. No. 159, Response to Mot. for Summ. J. at 3).

Congress authorized the DBE program in 1983 to assist women and minorities in the construction industry.  (Rec. No. 159, Response to Mot. for Summ. J. at 3).  The program is intended to prevent discrimination in highway construction projects funded by the federal government.  (Rec. No. 159, Response to Mot. for Summ. J. at 3). A large portion of the Cabinet's budget for highway construction is funded by the Federal Highway Administration ("FHWA").  (Rec. No. 159, Ex. 4, Yowell Dep. at 21).

    **C.**    **The OMA and the DBE Liaison.**

The Cabinet's DBE Program is administered through the Office of Minority Affairs ("OMA").  Norris Beckley was the Executive Director of the OMA during the relevant time periods. (Rec. No. 159, Ex. 45, Beckley Aff.).  The person with primary responsibility for the DBE Program is the DBE Liaison who is the liaison  between the DBE, the Cabinet and the FHWA.  (Rec. No. 159, Ex. 10, Repasky Draft Report at 4, 7-8).  The DBE Liaison during the relevant time period was Ronald Derricks.  (Rec. No. 159, Ex. 10, Repasky Draft Report at 4). Derricks reported to Beckley.

(Rec. No. 159, Ex. 10, Repasky Draft Report at 4).

### D.    The Cabinet's DBE Certification Committee.

The Cabinet's DBE Certification Committee determines whether applicants are eligible to be certified or renewed as a DBE and also determines whether a firm is eligible to remain certified as a DBE. 600 KAR 4:010 § 5(1).  The DBE Certification Committee consists of the: (a) Executive Director, Office of Minority Affairs or a designee, as chair and as a nonvoting member; (b) Deputy Secretary of the Transportation Cabinet or a designee; (c) Director, Division of Construction or a designee; (d) Director, Division of Highway Design or a designee; (e) Audit Manager, Internal Audit Branch or a designee; (f) Director, Division of Contract Procurement, or a designee; (g) Director, Division of Professional Services, or a designee; (h) Executive Director, Office of General Counsel or a designee, nonvoting member; and (i) Kentucky Administrator of the Federal Highway Administration or a designee, ex officio, nonvoting member. 600 KAR 4:010 § 5(2). Codell was not a member of the Certification Committee.  (Rec. No. 159, Ex. 1, Beckley Dep. at 25).  Codell asserts that Yowell was a member of the committee.  (Rec. No. 140, Codell Mot. for Summ. J. at 13).

A company is certified as a DBE or denied certification by a majority vote of the Certification Committee.   (Rec. No. 159, Ex. 1, Beckley Dep. at 25); 600 KAR 4:010 § 5(5). A denial of certification may be appealed to the Cabinet within thirty (30) days of the notice. 600 KAR 4:010 § 8(2).  Likewise, a firm may appeal a decision to decertify it as a DBE. 600 KAR 4:010 § 11(2). After an appeal is filed, the Cabinet must conduct a hearing. 600 KAR 4:010 § 11(2)(a).

The OMA submitted and received applications for DBE certifications by mail. It also submitted DBE certifications to the FHWA by mail. (Rec. No. 159, Ex. 45, Beckley Aff.).

3

E.    **DBE Participation Goals.**

The administrative regulations for the DBE programs state the following:

(a) The statutes authorizing this program provide that, except to the extent the Secretary determines otherwise, not less than 10 percent of the authorized funds are to be expended with DBEs.
(b) This 10 percent goal is an aspirational goal at the national level, which the Department uses as a tool in evaluating and monitoring DBEs' opportunities to participate in DOT-assisted contracts.
(c) The national 10 percent goal does not authorize or require recipients to set overall or contract goals at the 10 percent level, or any other particular level, or to take any special administrative steps if their goals are above or below 10 percent.

49 C.F.R. § 26.41.

The Cabinet Secretary sets the DBE participation goal for each particular project. The project goals are expressed as a percentage of the total amount of the federally-assisted contract at issue. (Rec. No. 159, Ex. 3, DBE Program Participation Goal 2002 at 3). Derricks and Codell met each month to discuss the DBE participation goals for upcoming construction projects. (Rec. No. 159, Ex. 8 at 14). Within 15 days of being awarded a prime contract, the prime contractor must show compliance with the DBE goal of the particular project. They can do this by producing evidence of the subcontracts with the DBEs or, if they have been unable to secure the required percentage of DBE subcontracts, by showing a good faith effort to do so. (Rec. No. 159, Ex. 10, Repasky Draft Report at 15).

F.    **The 2001 Review of the DBE Program and OMA.**

In 2001, the Cabinet initiated a review of the DBE program and the OMA after the African-American female owner of Geco Enterprises, Inc.("Geco"), a certified DBE, filed a gender discrimination claim against the Cabinet, the OMA, Beckley and Derricks. (Rec. No. 159, Ex. 10, Repasky Draft Report at 1). The review was conducted by attorney Wanda Ballard Repasky, Special

4

Counsel to the Cabinet.  (Rec. No. 159, Ex. 10, Repasky Draft Report at 2).  Repasky produced a

draft report which states that:

> The Cabinet has violated both the letter and the intent of the program in several areas, and has participated in fraud related to the program by approving DBE contracts with the knowledge that the designated DBEs would not be doing the work.  The purpose of the fraud was to secure federal highway funds.  In addition, the results of the investigation indicate that both prime contractors and DBEs have participated in the fraud.
>
> The review also revealed mismanagement of the DBE Program by the OMA which administers the program on behalf of the Cabinet, and a lack of fiscal and policy support of the DBE Program by the Cabinet and the administration.

(Rec. No. 159, Ex. 10, Repasky Draft Report at 1)

The report states that the OMA is "uniformly perceived to be in a state of chaos."  (Rec. No.

159, Ex. 10, Repasky Draft Report at 4).  The problems included Beckley's lack of leadership and

Derricks' performance as DBE Liaison.   (Rec. No. 159, Ex. 10, Repasky Draft Report at 5, 7-8).

Other problems included a lack of financial support for the OMA, failure to monitor DBE contracts

and failure to remove noncompliant DBEs, specifically Geco. (Rec. No. 159, Ex. 10, Repasky Draft

Report at 9, 12, 13).

Repasky also concluded that the DBE goals may not be entirely realistic in light of the

geographic availability of qualified DBEs, the amount and types of available projects and the

abilities of the certified DBEs. (Rec. No. 159, Ex. 10, Repasky Draft Report at 10).

The draft report states that Geco was the only DBE which consistently failed to comply with

the regulations despite numerous requests by the Cabinet to remedy the problem.  The report states

that "it is apparent that it was known to the upper levels of the Cabinet that GECO was not a

legitimate DBE contractor," but that no action was taken to decertify the company. (Rec. No. 159,

5

Ex. 10, Repasky Draft Report at 14).  The report further determined that it was clear that Geco was incapable of performing the work required under its subcontracts and that it "was and is widely understood within the Cabinet that [Geco] was not a legitimate DBE."  (Rec. No. 159, Ex. 10, Repasky Draft Report at 23).

The report noted that records regarding Geco revealed  "several instances of fraud within the program." The report stated this fraud was perpetrated by prime contractors and DBEs but was allowed with the knowledge of the OMA.  The report further states that, "if Derricks is to be believed that every job given to GECO was approved by his superiors,"  then the Cabinet at its highest levels was aware of the fraud involving Geco.  (Rec. No. 159, Ex. 10, Repasky Draft Report at 21).

The Plaintiffs contend that the Defendants violated RICO by conducting the Cabinet's affairs through a pattern of "racketeering activity."  18 U.S.C. § 1962(c). The Defendants now move for summary judgment.

## II.    ANALYSIS.

### A.    Standard on Summary Judgment.

Under the Motion for Summary Judgment standard, the moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id.* at 322-25.  Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

6

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**B.     The Civil RICO Claim.**

**1)     "Racketeering Activity."**

A violation of 18 U.S.C. § 1962(c) consists of the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Central Distributors of Beer, Inc. v. Conn*, 5 F.3d 181, 183 (6th Cir. 1993). "Racketeering activity" is defined in 18 U.S.C. § 1961(1)(B) as any act "indictable" under certain enumerated federal criminal laws, including 18 U.S.C. § 1341 which makes mail fraud a criminal offense. *Id.*  Pursuant to 18 U.S.C. § 1964(c), any person injured in his business or property by a violation of section 1962 may file suit in federal court to recover the damages he sustained.

"A civil RICO action does not require that there be a prior criminal conviction for the conduct forming the predicate act; however, the conduct used to support a civil RICO action must

be *indictable*." *Central Distributors*, 5 F.3d at 183.  Thus, the plaintiff must prove each prong of the predicate offense.  *Id*. at 183-84.  Moreover, a plaintiff only has standing to pursue a civil RICO action if he has been injured in his business or property by the predicate acts constituting the RICO violation. *Id.* at 184.

The Plaintiffs allege that the Defendants engaged in a pattern of racketeering activity by committing several acts of mail fraud.  Thus, to maintain their RICO action, the Plaintiffs must show that the Defendants committed each element of mail fraud.  "To allege a violation of the mail fraud statute, it is necessary to show that (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with specific intent to deceive or defraud." *Id*. (quoting *Schreiber Distributing Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1399-1400 (9th Cir. 1986)).

In their Amended Complaint, the Plaintiffs allege that the Defendants "have certified [as DBES] companies purporting to be owned and managed by minorities, although the defendants knew that the companies were actually owned or managed by non-minorities, or that the companies could not or did not perform the work. The defendants have also certified companies purporting to be owned and managed by women as DBE's, although the defendants knew that the companies were actually owned or managed by men or were otherwise ineligible for DBE certification."  (Rec. No. 36, Amended Complaint ¶ 22).

In response to the Defendants' Motions for Summary Judgment, the Plaintiffs allege that the Defendants engaged in the following specific acts of mail fraud:

**a)      The Scheme to Illegally Award DBE Subcontracts to Geco.**

Plaintiffs allege that prime contractor Elmo Greer & Sons ("Greer") awarded multiple

8

subcontracts to Geco, a certified DBE, to perform work on federally-funded highway construction

projects.  Greer would pay Geco only 3 percent of the cost of the subcontract and then not require

Geco  to actually perform any work. (Rec. No. 159, Response at 10).

The Plaintiffs allege that the individual Defendants engaged in the following acts in carrying

out this scheme:

- Yowell personally approved all payments on each contract in which Greer used Geco as a subcontractor.  (Rec. No. 159, Response at 33)
- Codell and Yowell permitted Greer to send false certifications to the FHWA and Codell signed reports to the FHWA falsely stating the amount of DBE participation on federal highway projects.  (Rec. No. 159, Response at 33-34)[1].
- Codell and Yowell knew Geco was not performing the work required.  (Rec. No. 159, Response at 12, 34).
- Yowell thwarted efforts to investigate Greer and Geco and called Greer to tip him off that the fraud had been discovered.  (Rec. No. 159, Response at 12, 34).[2]
- Codell and Yowell continued to approve all of the Geco-Greer contracts.  (Rec. No. 159, Response at 13).
- Codell ordered a halt to Repasky's investigation after a draft report exposed the fraud, and prevented the draft report from being completed or officially disseminated. (Rec. No. 159, Response at 34)[3].
- Codell and Yowell took no action to decertify Geco. (Rec. No. 159, Response at 34).

**b)     The Scheme to Certify Contractors Corporation, Inc.**

Plaintiffs allege that the Defendants caused Contractors Corporation, Inc. ("Contractors

Corp.")  to  be  certified  as  a  DBE  even  though  they  knew  it  was  only  a  "front"  for  Scotty's

---

[1] In support of these assertions, Plaintiffs cite Repasky's deposition at 89-90 and 90-91.  At pages 89-90, Repasky stated that, "[s]ince the Cabinet was counting commitments to use DBEs, instead of tracking what DBEs were actually being paid as required by the regulations, documents supplied to FHWA certified that the Cabinet's prime contractors were using DBE contractors to meet its goals, when in fact, the work was being performed by nonDBEs in violation of the law." At pages 90-91, Repasky states that these documents were provided to the FHWA by Derricks.

[2] Plaintiffs cite Yowell's deposition at pages 41 to 43 for the proposition that "Yowell called Greer to tip him off that his fraud had been discovered."  (Rec. No. 159, Response at 12).  There, Yowell actually testified that he called Greer's president to tell him that Geco "needed to do the work as they had set forth."  (Rec. No. 159, Response, Ex. 4, Yowell Depo. at 41).

[3] Plaintiffs cite no evidence in support of this allegation.

Contracting ("Scotty's), a major construction company. (Rec. No. 159, Response at 14). Contractors Corp. was owned by the wives of the top executives at Scotty's. (Rec. No. 159, Response at 14).

The Plaintiffs allege that the individual Defendants engaged in the following acts in carrying out this scheme:

- After OMA Executive Director Beckley notified Contractors Corp. that it did not qualify as a DBE, Yowell called Beckley to "vouch" for Contractors Corp. even though he knew the owners were married to the owners and executives of Scotty's Contracting. (Rec. No. 159, Response at 14, 35-36).
- Yowell and Codell knew that none of Contractors Corp.'s owners had sufficient experience to operate a construction company. (Rec. No. 159, Response at 36).
- Yowell requested that Beckley make a personal inspection of Contractors Corp. after OMA inspectors had recommended against certification. (Rec. No. 159, Response at 14, 35).
- When the Certification Committee rejected Contractors Corp's application, Codell overturned the decision.[4] (Rec. No. 159, Response at 15, 35).
- Yowell annually signed Contractors Corp.'s Certificate of Eligibility. (Rec. No. 159, Response at 15).
- Yowell personally approved payment on each contract on which Contractors Corp. was acting as a subcontractor. (Rec. No. 159, Response at 35).
- Yowell and Codell took no action to decertify Contractors Corp. (Rec. No. 159, Response at 36).[5]

### c)      The Scheme to Certify ST Construction, LLC

Plaintiffs allege that the Defendants caused ST Construction, LLC, a company owned by Tina Conner, to be certified as a DBE even though Conner and her husband had a net worth of $1.9

---

[4] In support of this allegation, Plaintiffs cite their Exhibit 14, an order signed by Codell stating that "[u]pon review of the recommendation of the Hearing Officer. . .IT IS HEREBY ORDERED that certification be issued to the Petitioner." Thus, it appears that Codell signed this order  after a hearing was conducted and the hearing officer recommended certification.

[5] Todd Shipp, attorney for the Cabinet, testified that the fact that an applying company's owners are married to owners of another construction company does not by itself disqualify an applying company from being certified as a DBE.  Instead, it raises a red flag. In Contractors Corp.'s case, Shipp testified that he did not believe that Derricks had compiled sufficient evidence that Contractors Corp. was not a legitimate DBE to ensure that the Cabinet would win a hearing challenging a decision to deny certification.  Further, Contractors Corp. had produced evidence that it was legitimate and that it did quality work.  Shipp testified that he, his boss and the deputy secretary therefore recommended certification to the Certification Committee. (Rec. No. 140, Mot. for Summ. J., Ex. 5, Shipp Dep. at 73-77).

million and were not, therefore, "disadvantaged."  In addition, the company was to be managed by

Conner's husband.  (Rec. No. 159, Response at 16).

The Plaintiffs allege that the individual Defendants engaged in the following acts in carrying

out this scheme:

- Codell ordered Beckley and Derricks to meet with Connor.  (Rec. No. 159, Response at 16, 37).
- Codell told Beckley, if we don't. . . get this done, the governor's going to have your head and mine."  (Rec. No. 159, Response at 37 and Ex. 1, Beckley Dep. at 82-83).
- Codell pressured Beckley to approve Connor's revised application which stated a lower income within the DBE guidelines.  (Rec. No. 159, Response at 17).

### d)      The Scheme to Certify ProMark Construction, Inc.

Plaintiffs allege that the Defendants caused ProMark Construction, Inc. ("ProMark") to be

certified as a DBE even though it was affiliated with Highway Markings, Inc., a company that

performed similar services and was not a DBE. (Rec. No. 159, Response at 18). ProMark's owners

were related to Highway Markings's owners.  (Rec. No. 159, Response at 18).

The Plaintiffs allege that the individual Defendants engaged in the following acts in carrying

out this scheme:

- Codell attended a meeting when ProMark "called out" Derricks for the delay in approving ProMark's certification.  (Rec. No. 159, Response at 19).[6]
- Codell ordered Beckley and Todd Shipp, a Cabinet attorney, to meet with ProMark. (Rec. No. 159, Response at 19, 38).
- Codell took no action to decertify ProMark.  (Rec. No. 159, Response at 38).

### e)      The Scheme to Certify N.H. Stone, Inc.

Plaintiffs allege that the Defendants permitted N.H. Stone to remain certified as a DBE even

though the net worth of its owner, Olivia Stone, exceeded the $750,000 limit.  (Rec. No. 159,

---

[6] Plaintiffs cite Exhibit 8, pages 99-101 of Derricks' deposition in support of this assertion. Plaintiffs attach portions of Derricks' deposition at Exhibit 8 but pages 99-101 are not included.

Response at 22-23).

The Plaintiffs allege that the individual Defendants engaged in the following acts in carrying out this scheme:

- the OMA staff told Yowell that Olivia Stone's net worth exceeded the limits but he did not inform anyone and did not investigate it. (Rec. No. 159, Response at 23).
- Codell read an article in which Olivia Stone stated that Fred Clark "bids the work and takes care of all that stuff" and that she only gets the mail, distributes it to the employees and signs the payroll checks, the bid bonds and the contracts. After reading the article, Codell took no action. (Rec. No. 159, Response at 24)
- In 2002, Derricks notified Codell of N.H. Stone's ineligibility on three grounds: excessive earnings, excessive net worth and lack of control by Olivia Stone. (Rec. No. 159, Response at 25).

**f)     The Scheme to Induce DBEs to Bid on the Shawnee Expressway Project.**

Plaintiffs allege that the Defendants represented to DBEs that the Shawnee Expressway Project offered "ample" or "many" opportunities for DBEs and encouraged them to submit bids on the project to prime contractors. The Cabinet set a six-percent DBE participation goal for the project which Plaintiffs contend was too low. Plaintiffs Chaz Concrete, Grant Trucking and Kentucky Transfer each submitted bids to all the bidding prime contractors. The Cabinet awarded the prime contract to Kokosing Construction. Kokosing rejected the subcontract bids from the plaintiffs Chaz Concrete, Grant Trucking and Kentucky Transfer and purported to meet the DBE goal by awarding a subcontract to N.H. Stone. (Rec. No. 159, Response at 28-29).

The Plaintiffs allege that the individual Defendants engaged in the following acts in carrying out this scheme:

- Yowell sent a memo to all DBE Contractors announcing that the project may be the largest contract ever bid by the Cabinet and would offer many opportunities for those firms who wish to provide subcontract quotations. (Rec. No. 159, Response at 27).
- Yowell sent a letter to Kentucky Transfer's owner Maurice Sweeney that he had "made a personal commitment to [State] Senator Gerald Neal that the Cabinet would

exert every effort in the recruitment of local firms for the construction of this multi-million dollar project." (Rec. No. 159, Response at 27).

- Codell set a 6% goal for DBE participation on the project. (Rec. No. 159, Response at 28-29).
- The Defendants approved the DBE participation plan submitted by Kokosing even though they knew that N.H. Stone was not qualified to be a DBE. (Rec. No. 159, Response at 29).
- Yowell offered Chaz a small, but illegal, set-aside project to pacify African-American contractors. (Rec. No. 159, Response at 29, 41)[7].

**g)**   **The Scheme to award the Subcontract on the Kentucky Highway 431 Project to Contractors Corp. and N.H. Stone.**

Scotty's was the prime contractor on a the Kentucky Highway 431 Project. Scotty's awarded Plaintiff Green River Seed a subcontract for the provision of guardrail, fencing, seed and sod but later terminated the subcontract. Scotty's then entered into a subcontract with Contractors Corp. for the provision of seed and sod on the project. (Rec. No. 159, Response at 10). After Green River complained to the OMA that Contractors Corp. was not a legitimate DBE, Scotty's entered into a subcontract with N.H. Stone as the DBE on the project. (Rec. No. 159, Response at 21).

The Plaintiffs allege that the individual Defendants engaged in the following acts in carrying out this scheme:

- the Defendants approved N.H. Stone as the DBE on the project, knowing that it was not a qualified DBE. (Rec. No. 159, Response at 21).
- Yowell met with Georgina Grant, CEO of Green River, and angrily defended

---

[7] In their memorandum, Plaintiffs assert the following: "[Yowell] knew the set aside was 'illegal,' but stated he was going to do it anyway. When asked whether he was serious due to the illegality of the proposal, Yowell reiterated his intentions to proceed and that because it was illegal, he would simply call it a 'pilot project.'" In support of this assertion, Plaintiffs cite to Yowell's deposition at page 101.
    There, Yowell actually testified that, "our rules and regulations as formulated by the Federal Highway Administration do not allow what I would call DBE set-asides where we can ascertain that the only bidders acceptable would be DBE companies, but what I was proposing would have been one where there was a near certainty that a DBE firm would do the work." When asked how that project would work, Yowell stated "contrary to our specifications, which at that time required a prime contractor to do 50 percent of the work on a project, that we would set that requirement, waive that, which was within my. . ." Plaintiffs did not submit the following page of Yowell's deposition containing the remainder of this discussion. (Rec. No. 159, Response, Ex. 4, Yowell's Dep. at 101).

13

Scotty's.  (Rec. No. 159, Response at 22).

- •    The Defendants have approved Scotty's awarding of subcontracts to Contractors Corp. on subsequent construction projects.  (Rec. No. 159, Response at 22).
- •    Yowell permitted Green River to be removed from the project.(Rec. No. 159, Response at 39).
- •    Codell and Yowell approved the replacement of Contractors Corp. with N.H. Stone. (Rec. No. 159, Response at 39).
- •    Codell and Yowell approved the DBE re-certification of N.H. Stone in 2000 and 2002.  (Rec. No. 159, Response at 39).
- •    The defendants knew N.H. Stone was not a legitimate DBE.  (Rec. No. 159, Response at 39).

In addition to these schemes to defraud, in its prior opinion in this case, the Sixth Circuit discussed a scheme to defraud which encompassed these specific schemes. This larger scheme was the Defendants' scheme to induce individuals or companies to expend money to become certified as DBEs, to maintain their DBE certification and/or to bid on subcontracts despite the Defendants' knowledge that they were not administering the DBE program in compliance with the law.  (Rec. No. 159, Response at 32-33).

### 2)    Standing.

The first issue in this case is whether the Plaintiffs have produced sufficient evidence to establish standing to complain about the Defendants' alleged acts of mail fraud.  To establish standing in a civil RICO case relying on the predicate act of mail fraud, the plaintiff must show that the defendant made misrepresentations or omissions of material fact to the plaintiff and that the plaintiff relied on those misrepresentations or omissions to its detriment. *Central Distributors*, 5 F.3d at 183; *see also, Chaz Construction,* 137 Fed. Appx. at  738-39.

The plaintiff must plead with particularity the false statements of fact made by the defendants to the plaintiffs and the facts showing that the plaintiff relied on those statements to its detriment. *Central Distributors*, 5 F.3d at 183 (citing *Blount Financial Svcs., Inc. v. Walter E. Heller & Co.*,

819 F.2d 151, 152 (6th Cir.1987).  "Thus, the defendants must make a false statement or omission of fact *to the plaintiff*" to support a RICO claim based on the predicate act of mail fraud.  *Id*.

Plaintiffs address standing only briefly in their memorandum stating that Chaz owner Berkley "made the decision to enter the construction business, chose to create a ready-mix concrete company and become certified as a DBE because of the Defendants' representations." (Rec. No. 159, Response at 49).  Plaintiffs also state generally without any citation to the evidence that "[t]he other plaintiffs have similar losses of capital from forming and operating their business."  (Rec. No. 159, Response at 50). In this portion of their memorandum, Plaintiffs never state specifically what representations the Defendants made to them.  Nevertheless, the Court has reviewed Plaintiffs' memorandum and the evidence cited in support in order to determine specifically what representations the Plaintiffs allege that the Defendants made to them.

     a)     **Schemes to Award Subcontracts to Geco and to Falsely Certify Contractors Corp., ST Construction, ProMark and N.H. Stone.**

As to the alleged scheme to award subcontracts to the illegitimate Geco and the schemes to falsely certify Contractors Corp., ST Construction, ProMark and N.H. Stone,  the Plaintiffs do not allege that these schemes involved any representations from the Defendants to the Plaintiffs or any communications between the Defendants and Plaintiffs at all.  These schemes may still be relevant with regard to whether the Defendants undertook a "pattern of racketeering activity" and to demonstrate the Defendants' knowledge that the DBE program was not being administered in compliance with the law.  Nevertheless, these schemes did not involve any representations from the Plaintiffs to the Defendants that establish the Plaintiffs' standing.

**b)      Scheme to Award Kentucky Highway 431 Project Subcontracts to Contractors Corp. and N.H. Stone.**

As to the alleged scheme to award the subcontract on the Kentucky Highway 431 Project to Contractors Corp. and N.H. Stone, the only communication that Plaintiffs allege occurred between the Plaintiffs and the Defendants was a meeting between Yowell and Green River's CEO in which Yowell "defended" Scotty's. Even assuming that this constitutes a false representation that Scotty's was acting honestly, there is no allegation that Green River took any action in reliance on this representation.

**c)      Scheme to Entice DBEs to Bid on the Shawnee Expressway Project.**

As to the alleged scheme to entice DBEs to bid on the Shawnee Expressway Project, Plaintiffs cite a memorandum addressed to "All Certified Disadvantaged Business Enterprise Contractors" from Defendant Yowell. (Rec. No. 159, Response, Ex. 41). In the memorandum, Yowell announces that the Cabinet will receive bids for the Shawnee Expressway Project. He further states that the project "will offer many opportunities for those firms who wish to provide subcontract quotations." Yowell instructs the DBEs to make every effort to attend an informational conference.

Plaintiffs also cite a letter from Yowell to Kentucky Transfer owner Maurice Sweeney stating that Yowell had promised State Senator Gerald Neal that the Cabinet would exert every effort to recruit local firms on the Shawnee Expressway Project. (Rec. No. 159, Response, Ex. 43).

Plaintiffs also cite the deposition testimony of Chaz owner Berkley who testified that, prior to forming Chaz, he met with Yowell and OMA Executive Director Beckley who explained that the state had a problem meeting their DBE participation goals in rural counties because of the lack of qualified DBEs in those areas. They explained that they hoped to get a higher DBE participation of

16

15, 20 or 30 percent on Louisville projects to offset the low percentages in rural counties. (Rec. No. 159, Response, Ex. 5, Berkley Dep. at 31-32). When asked to explain how Codell or Yowell misled him, Berkley stated that they told him "they would lean more or less towards the company that had the higher percentage of [DBE] participation." (Rec. No. 151, Ex. 5, Berkley Dep. at 31).

Yowell testified that he met with Berkley because Berkley was "wanting to do work on the Shawnee Expressway." (Rec. No. 159, Ex. 4, Yowell Dep. at 97). Yowell recalled telling Berkley that "ample opportunities" would be forthcoming from the Shawnee Expressway Project for interested DBEs. Yowell testified that he was "really promoting the project." (Rec. No. 159, Ex. 4, Yowell Dep. at 97).

Chaz Concrete, Grant Trucking and Kentucky Transfer all eventually bid on the Shawnee Expressway Project.[8] Thus, Plaintiffs have produced sufficient evidence to withstand a motion for summary judgment that Chaz Concrete, Kentucky Transfer and Grant Trucking bid on the Shawnee Expressway project in reliance on Yowell's representations.

**d)      Scheme to Entice Entities to Participate in the DBE Program.**

As to the larger scheme of the Defendants to entice individuals and companies to enter into the DBE program, remain in the DBE program and/or bid on projects even though the Defendants knew the program was not being administered in compliance with the law, in its prior opinion, the Sixth Circuit determined that the Plaintiffs had made sufficient allegations to withstand a motion to dismiss that the Plaintiffs had relied on the Defendants' representations that the DBE program was

---

[8] In his Motion for Summary Judgment, Codell argues there is no evidence that Grant Trucking actually submitted any bids on the project. Plaintiffs have not produced any evidence that Grant Trucking bid on the project. Because the Court dismisses Grant Trucking's claims on other grounds, it is not necessary to resolve this issue in this Opinion.

fairly administered. The case is now before this Court on a Motion for Summary Judgment. Accordingly, it is now incumbent upon the Plaintiffs to produce evidence of the Defendants' representations which the Plaintiffs relied upon in entering into and remaining in the DBE program.

At this point in the analysis it is important to reiterate that the Plaintiffs' claims are against two *individuals*. Thus, while it may be a given that the Plaintiffs believed that the DBE program was fairly run when they chose to participate in it, they must point to specific statements by these individual Defendants that induced the Plaintiffs to enter into the DBE program, maintain DBE certification and/or bid on projects.

In their memorandum, the Plaintiffs allege that the Defendants made "false statements that the program was operated in an honest manner and in compliance with federal law, and that they would be permitted to compete on particular projects only with other, legitimate DBE companies." (Rec. No. 159, Response at 32). The Plaintiffs also allege that Codell and Yowell disseminated public reports and statements falsely stating that the DBE program was being conducted fairly and honestly and in compliance with federal and state regulations. As evidence of these allegations, in addition to Yowell's memorandum regarding the Shawnee Expressway Project discussed above, Plaintiffs cite Exhibit Nos. 2, 3 and 40 of their Response to the Defendants' Motions for Summary Judgment. (Rec. No. 159, Defs.' Response at 34, 36, 38, 41).

Exhibits 2 and 3 are documents respectively titled "Disadvantaged Business Enterprise Program Participation Goal FY 2001" and "Disadvantaged Business Enterprise Program Participation Goal FY 2002." Exhibit No. 2's front page lists the names of Codell and Beckley and Exhibit No. 3's front page lists the names of Yowell, Beckley and Derricks indicating that the Defendants authorized or helped to prepare the documents. Plaintiffs do not, however, allege that

they received these documents. In fact, in their memorandum, the Plaintiffs indicate that these documents were "communication[s] to the Federal Highway Administration". (Rec. No. 159, Response at 4). Because the Plaintiffs never received these documents, they could not have relied on them.

Exhibit 40 is a document titled "Kentucky Transportation Cabinet Office of Minority Affairs, Information for Determining Disadvantaged Business Enterprise/Woman Business Enterprise Eligibility, 'Schedule A.'" The document is an application containing information about N.H. Stone, Inc. and is signed by Olivia Stone as the company's president. It appears that Ms. Stone may have mailed this document to the Kentucky Transportation Cabinet. There is no evidence that the document was written or disseminated by the individual Defendants or that the Plaintiffs received the document.

To the extent that Plaintiffs contend they each received a blank "Schedule A" from the Cabinet, there is no evidence or allegation that the individual Defendants supplied it to them. Further, the blank Schedule A does not contain any representations but instead solicits information.[9] Thus, Exhibit 40 is not evidence of either the Defendants' representations or the Plaintiffs' detrimental reliance.

In addition, in their memorandum, Plaintiffs allege that Green River "invested capital, time and effort in forming the company and bidding on DBE contracts. Like Chaz Concrete, it made the decision to form the company, and to form it as a DBE, because of the false statements made by the defendants." (Rec. No. 159, Response at 53). Plaintiffs, however, do not explain what "false

---

[9] It may be that the Plaintiffs cited Ex. 40 in error. To the extent that Plaintiffs intended to reference Yowell's letters and memoranda regarding the Shawnee Expressway Project at Ex. 41 to 43, the Court has previously addressed the representations contained in those.

19

statements" the Defendants made to Green River.  Nor do they cite any evidence in the record in support of this allegation.

Accordingly, the Plaintiffs have presented sufficient evidence that Defendant Yowell represented to the Plaintiffs Chaz, Grant Trucking and Kentucky Transfer that the Shawnee Expressway Project offered many opportunities for DBEs.  The Plaintiffs have also produced sufficient evidence that these Plaintiffs took some action in reliance on those representations. Accordingly, Chaz, Grant Trucking and Kentucky Transfer have standing to challenge the Defendants' alleged scheme to induce DBEs to bid on the Shawnee Expressway Project.

Plaintiffs have not, however, produced any evidence that the Plaintiff Green River Seed took any action in reliance on the Defendants' allegedly false representations.  Accordingly, its claims must be dismissed for lack of standing. [10]

---

[10]  Related to the standing inquiry is the requirement that a plaintiff prove that the the RICO violation was the "proximate cause" of the plaintiff's injury.  *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992).  In *Holmes*, the Court explained that "proximate cause" requires "some direct relation between the injury asserted and the injurious conduct alleged."  *Id*. at 268.  This is because the "less direct an injury is , the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors."  *Id*. at 269.  In *Trollinger v. Tyson Foods, Inc.*, the Sixth Circuit stated that, in the context of a RICO claim, standing and proximate cause are overlapping concepts.  370 F.3d 602, 612-13  (6th Cir. 2004).  This is because, "they both grow out of the 'by reason of' limitation in RICO – namely, the requirement that claimants establish that their injury was 'by reason of' a RICO predicate act violation."  *Id*. at 613.  More recently, the Supreme Court has clarified that "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  *Anza v. Ideal Steel Supply Corp.*, 126 S.Ct. 1991, 1998 (2006).

In response to the Defendants' Motion for Summary Judgment, the Plaintiffs assert that, as one element of their damages, they are entitled to recover the lost profits on subcontracts awarded to the falsely certified DBEs.  However, none of the schemes alleged by the Plaintiffs would have directly caused them to lose subcontracts.  As to the awarding of  subcontracts to Geco and the Defendants' alleged acts to falsely certify Contractors Corp., ST Construction, LLC, ProMark Construction, Inc., and N.H. Stone, Inc., the direct victim of these mail fraud schemes would have been the FHWA.  There is no evidence that the Plaintiffs would have been qualified to receive any subcontracts awarded to these DBEs. Further, there are too many intervening factors between the Defendants' alleged acts and the Plaintiffs' inability to obtain the subcontracts that were awarded to the illegitimate DBEs.  The most obvious intervening factor is the prime contractor's selection of subcontractors.  Likewise, as to the Kentucky Highway 431,  there are too many intervening factors between the Defendants acts to certify N.H. Stone and Contractors Corp. and the Plaintiffs' inability to receive these subcontracts. Again, the most important intervening factor is the prime contractors' choice of other subcontractors.  *See Imagineering, Inc. v. Kiewit Pacific. Co.,* 976 F.2d 1303 (9th Cir. 1992).

**2)      The Falsity of Yowell's Representations regarding the Shawnee Expressway Project.**

The mail fraud statute requires a specific intent to defraud. *United States v. DeSantis,* 134 F.3d 760, 764 (6th Cir. 1998). "This means not only that a defendant must knowingly make a material misrepresentation or knowingly omit a material fact, but also that the misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission." *Id*. Alternatively, it is sufficient to prove that the defendant was reckless, defined as making an extreme departure from the standards of ordinary care by omitting information which presents a danger of misleading the recipient that is either known to the defendant or is so obvious that the actor must have been aware of it. *Id*.

Again, the representations at issue are Yowell's representations that the Shawnee Expressway Project offered "many" or "ample" opportunities for DBEs; that, in awarding the contract, the state would "lean more or less towards" the company that would award subcontracts to the most DBEs; and that the Cabinet would make every effort to recruit local firms for the project.

The problem with proving the falsity of these statements is that the statements are ambiguous. Yowell did not represent that the Shawnee Expressway Project would present an opportunity for DBEs to earn a specific amount. Nor did he represent that a certain number of DBEs would be hired to work on the Shawnee Expressway Project. Nor did he promise a specific percentage of the contract would be awarded to DBEs. Instead, he represented only that the project offered "ample"

---

As to the scheme to entice entities to participate in the DBE Program, including the scheme to entice DBEs to bid on the Shawnee Expressway Project, these schemes did not directly cause the Plaintiffs to lose subcontracts. These schemes, however, have directly caused Plaintiffs to expend money to become certified, maintain certification and/or bid on the projects involved.

21

or "many" opportunities.  Likewise, Yowell did not represent that the prime contractor offering the higher percentage of DBE participation would certainly receive the contract.  He represented only that the state would "lean more or less towards" the company who would award the higher percentage of the contract to DBE subcontractors.

As evidence of Yowell's knowledge of the falsity of these statements, Plaintiffs cite a memorandum from Yowell to Codell dated October 28, 2002, stating that DBE participation goal on the project would be six percent.  (Rec. No. 159, Response, Ex. 44).  Plaintiffs, however, have produced no evidence from which a jury could infer that this percentage is low and, thus, that Yowell's representations were false.  Plaintiffs have produced no evidence regarding the number of DBEs who bid on the project or the number of DBEs in the area who were qualified to perform the work.  Plaintiffs have also failed to produce any evidence regarding the DBE percentages offered by other bidding prime contractors.  Further, Plaintiffs have failed to produce evidence that, assuming that some bidding prime contractors submitted higher DBE percentage goals than Kokosing, those prime contractors were actually qualified to perform the work and, thus, should have been awarded the contract.

Thus, there is no evidence from which a juror could conclude that the Shawnee Expressway Project did not actually offer ample opportunities to DBEs or that, if it did not, Yowell knew that it would not.  Nor is there any evidence that the Cabinet did not, in fact, make every effort to recruit local firms for the project or that, if it did not, Yowell knew that it did not.  Nor is there any evidence that the Cabinet did not, in fact, "lean more or less towards" the company who submitted the higher DBE percentage or that, if it did not, Yowell knew that it would not.   Accordingly, the claims of Chaz Concrete, Kentucky Transfer and Grant Trucking against the Defendants must be dismissed.

22

By dismissing this action, the Court does not intend to convey that there were no problems with the DBE program during the Defendants' employment at the Cabinet. In order for the Plaintiffs to assert a RICO claim against the individual Defendants, however, the Plaintiffs must prove more than the existence of problems with the program. The Plaintiffs must show that Codell and/or Yowell themselves actually made false representations to each of the Plaintiffs which the Plaintiffs relied on to their detriment. The only representations that Plaintiffs allege the Defendants made to them related to the Shawnee Expressway Project. As discussed above, those representations by Yowell were ambiguous and Plaintiffs have failed to produce sufficient evidence that the representations were false or that Yowell knew they were false. For these reasons, this action must be dismissed.

## III.   CONCLUSION.

For all the above reasons, the Court hereby ORDERS as follows:

1)    The Motions for Summary Judgment of the Defendants James C. Codell, III and J.M. Yowell (Rec. Nos. 140 and 141) are GRANTED; and

2)    This matter is STRICKEN from the active docket of this Court.

Dated this 14th day of June, 2007.



Signed By:

**_Karen K. Caldwell_**

**United States District Judge**