UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at FRANKFORT

Eastern District of Kentucky
**FILED**

MAR 2 9 2010

AT LEXINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

CIVIL ACTION NO. 3:03-52-KKC

CHAZ CONCRETE CO., LLC, GRANT TRUCKING, INC.,
SWEENEY ENTERPRISES, INC. d/b/a
KENTUCKY TRANSFER LINE, and GREEN
RIVER SEED AND SOD, INC.,                                     PLAINTIFFS,

v.                                    **OPINION AND ORDER**

JAMES C. CODELL, III,
and J.M. YOWELL,                                             DEFENDANTS.

\*\*\*\*   \*\*\*\*   \*\*\*\*

This matter is before the Court on the Defendants' second Motions for Summary Judgment (Rec. Nos. 191 and 193).

The Plaintiffs in this action assert a civil claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO") alleging that the Defendants, former officials in the Kentucky Transportation Cabinet, used the mail to fraudulently permit companies to become certified as Disadvantaged Business Enterprises (DBEs) that were not actually disadvantaged. To be certified as DBEs, companies must be owned and run by women or minorities. The DBE program is intended to help women and minorities obtain a portion of federally-funded highway construction projects. The Plaintiffs are legitimate DBEs who allege they were injured by the Defendants' acts.

This Court granted the Defendants' first Motions for Summary Judgment relying on then-existing Sixth Circuit precedent requiring that, to establish standing in a civil RICO action based on mail fraud, a plaintiff must establish that the defendant made misrepresentations to the plaintiff upon which the plaintiff relied.

However, after this Court issued its opinion, the Supreme Court decided *Bridge v. Phoenix*

*Bond & Indemnity Co.*, 553 U.S. 639, 128 S.Ct. 2131 (2008) which overruled that Sixth Circuit precedent.  In light of *Bridge*, the Sixth Circuit reversed this Court's prior summary judgment ruling and remanded the case for further proceedings consistent with *Bridge*.

The Defendants again move for summary judgment in their favor.  Because nothing has changed in the facts since the Court's prior summary judgment ruling and no party has objected to any of the Court's prior factual findings, the facts set forth below are largely adopted from the Court's prior ruling.

### I.        FACTS.

### A.        The Defendants.

As a result of prior opinions by this court and the Sixth Circuit in *Chaz Construction, LLC v. Codell*, 137 Fed. Appx. 735 (6th Cir. 2005), the sole claims remaining in this case are the Plaintiffs' claims against the Defendants James C. Codell III ("Codell") and J.M. Yowell ("Yowell") in their individual capacities. Plaintiffs assert that the individual Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") , 18 U.S.C. § 1961, *et seq.,* and conspired to violate RICO by operating the Kentucky Transportation Cabinet (the "Cabinet") as an enterprise to commit fraud in the awarding of contracts under the Disadvantage Business Enterprise ("DBE") program. (Rec. No. 36, Amended Complaint ¶ 1).

Codell was the Secretary of the Cabinet from 1996 to 2003. (Rec. No. 36, Amended Complaint ¶ 8; Rec. No. 141, Mot. for Summ. J. at 3). Yowell was the Cabinet's State Highway Engineer from 1992 to 2004.  (Rec. No. 36, Amended Complaint ¶ 9; Rec. No. 141, Mot. for Summ. J. at 3).

### B.        The Plaintiffs and the DBE Program.

2

Plaintiffs are Chaz Concrete Co., L.L.C. ("Chaz"), Grant Trucking, Inc. ("Grant Trucking"), Sweeney Enterprises, Inc. d/b/a Kentucky Transfer Line ("Kentucky Transfer") and Green River Seed and Sod, Inc. ("Green River"). Each of the Plaintiffs was or is certified by the Cabinet as a DBE (Rec. No. 159, Response to Mot. for Summ. J. at 4). A DBE is a small business which is at least 51-percent owned and managed by individuals who are both socially and economically disadvantaged. (Rec. No. 159, Response to Mot. for Summ. J. at 3).

Congress authorized the DBE program in 1983 to assist women and minorities in the construction industry. (Rec. No. 159, Response to Mot. for Summ. J. at 3). The program is intended to prevent discrimination in highway construction projects funded by the federal government. (Rec. No. 159, Response to Mot. for Summ. J. at 3). A large portion of the Cabinet's budget for highway construction is funded by the Federal Highway Administration ("FHWA"). (Rec. No. 159, Ex. 4, Yowell Dep. at 21).

### C.     The OMA and the DBE Liaison.

The Cabinet's DBE Program is administered through the Office of Minority Affairs ("OMA"). Norris Beckley was the Executive Director of the OMA during the relevant time periods. (Rec. No. 159, Ex. 45, Beckley Aff.). The person with primary responsibility for the DBE Program is the DBE Liaison who is the liaison between the DBE, the Cabinet and the FHWA. (Rec. No. 159, Ex. 10, Repasky Draft Report at 4, 7-8). The DBE Liaison during the relevant time period was Ronald Derricks. (Rec. No. 159, Ex. 10, Repasky Draft Report at 4). Derricks reported to Beckley. (Rec. No. 159, Ex. 10, Repasky Draft Report at 4).

### D.     The Cabinet's DBE Certification Committee.

The Cabinet's DBE Certification Committee determines whether applicants are eligible to

3

be certified or renewed as a DBE and also determines whether a firm is eligible to remain certified as a DBE. 600 KAR 4:010 § 5(1). The DBE Certification Committee consists of the: (a) Executive Director, Office of Minority Affairs or a designee, as chair and as a nonvoting member; (b) Deputy Secretary of the Transportation Cabinet or a designee; (c) Director, Division of Construction or a designee; (d) Director, Division of Highway Design or a designee; (e) Audit Manager, Internal Audit Branch or a designee; (f) Director, Division of Contract Procurement, or a designee; (g) Director, Division of Professional Services, or a designee; (h) Executive Director, Office of General Counsel or a designee, nonvoting member; and (i) Kentucky Administrator of the Federal Highway Administration or a designee, ex officio, nonvoting member. 600 KAR 4:010 § 5(2). Codell was not a member of the Certification Committee. (Rec. No. 159, Ex. 1, Beckley Dep. at 25). Codell asserts that Yowell was a member of the committee. (Rec. No. 140, Codell Mot. for Summ. J. at 13).

A company is certified as a DBE or denied certification by a majority vote of the Certification Committee. (Rec. No. 159, Ex. 1, Beckley Dep. at 25); 600 KAR 4:010 § 5(5). A denial of certification may be appealed to the Cabinet within thirty (30) days of the notice. 600 KAR 4:010 § 8(2). Likewise, a firm may appeal a decision to decertify it as a DBE. 600 KAR 4:010 § 11(2). After an appeal is filed, the Cabinet must conduct a hearing. 600 KAR 4:010 § 11(2)(a).

The OMA submitted and received applications for DBE certifications by mail. It also submitted DBE certifications to the FHWA by mail. (Rec. No. 159, Ex. 45, Beckley Aff.).

### E.   DBE Participation Goals.

The administrative regulations for the DBE programs state the following:

(a) The statutes authorizing this program provide that, except to the extent the Secretary determines otherwise, not less than 10 percent of the authorized funds are to be expended with DBEs.

4

(b) This 10 percent goal is an aspirational goal at the national level, which the Department uses as a tool in evaluating and monitoring DBEs' opportunities to participate in DOT-assisted contracts.

(c) The national 10 percent goal does not authorize or require recipients to set overall or contract goals at the 10 percent level, or any other particular level, or to take any special administrative steps if their goals are above or below 10 percent.

49 C.F.R. § 26.41.

The Cabinet Secretary sets the DBE participation goal for each particular project. The project goals are expressed as a percentage of the total amount of the federally-assisted contract at issue. (Rec. No. 159, Ex. 3, DBE Program Participation Goal 2002 at 3). Derricks and Codell met each month to discuss the DBE participation goals for upcoming construction projects. (Rec. No. 159, Ex. 8 at 14). Within 15 days of being awarded a prime contract, the prime contractor must show compliance with the DBE goal of the particular project. They can do this by producing evidence of the subcontracts with the DBEs or, if they have been unable to secure the required percentage of DBE subcontracts, by showing a good faith effort to do so. (Rec. No. 159, Ex. 10, Repasky Draft Report at 15).

**F.    The 2001 Review of the DBE Program and OMA.**

In 2001, the Cabinet initiated a review of the DBE program and the OMA after the African-American female owner of Geco Enterprises, Inc.("Geco"), a certified DBE, filed a gender discrimination claim against the Cabinet, the OMA, Beckley and Derricks. (Rec. No. 159, Ex. 10, Repasky Draft Report at 1). The review was conducted by attorney Wanda Ballard Repasky, Special Counsel to the Cabinet. (Rec. No. 159, Ex. 10, Repasky Draft Report at 2). Repasky produced a draft report which states that:

The Cabinet has violated both the letter and the intent of the program in several areas, and has participated in fraud related to the program by approving DBE contracts with

5

the knowledge that the designated DBEs would not be doing the work. The purpose of the fraud was to secure federal highway funds. In addition, the results of the investigation indicate that both prime contractors and DBEs have participated in the fraud.

The review also revealed mismanagement of the DBE Program by the OMA which administers the program on behalf of the Cabinet, and a lack of fiscal and policy support of the DBE Program by the Cabinet and the administration.

(Rec. No. 159, Ex. 10, Repasky Draft Report at 1)

The report states that the OMA is "uniformly perceived to be in a state of chaos." (Rec. No. 159, Ex. 10, Repasky Draft Report at 4). The problems included Beckley's lack of leadership and Derricks' performance as DBE Liaison. (Rec. No. 159, Ex. 10, Repasky Draft Report at 5, 7-8). Other problems included a lack of financial support for the OMA, failure to monitor DBE contracts and failure to remove noncompliant DBEs, specifically Geco. (Rec. No. 159, Ex. 10, Repasky Draft Report at 9, 12, 13).

Repasky also concluded that the DBE goals may not be entirely realistic in light of the geographic availability of qualified DBEs, the amount and types of available projects and the abilities of the certified DBEs. (Rec. No. 159, Ex. 10, Repasky Draft Report at 10).

The draft report states that Geco was the only DBE which consistently failed to comply with the regulations despite numerous requests by the Cabinet to remedy the problem. The report states that "it is apparent that it was known to the upper levels of the Cabinet that GECO was not a legitimate DBE contractor," but that no action was taken to decertify the company. (Rec. No. 159, Ex. 10, Repasky Draft Report at 14). The report further determined that it was clear that Geco was incapable of performing the work required under its subcontracts and that it "was and is widely understood within the Cabinet that [Geco] was not a legitimate DBE." (Rec. No. 159, Ex. 10,

6

Repasky Draft Report at 23).

The report noted that records regarding Geco revealed "several instances of fraud within the program." The report stated this fraud was perpetrated by prime contractors and DBEs but was allowed with the knowledge of the OMA. The report further states that, "if Derricks is to be believed that every job given to GECO was approved by his superiors," then the Cabinet at its highest levels was aware of the fraud involving Geco. (Rec. No. 159, Ex. 10, Repasky Draft Report at 21).

### G.    The Civil RICO Claim.

The Plaintiffs contend that the Defendants violated RICO by conducting the Cabinet's affairs through a pattern of "racketeering activity." 18 U.S.C. § 1962(c).

A RICO action under Section 1962(c) consists of the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Central Distributors of Beer, Inc. v. Conn*, 5 F.3d 181, 183 (6th Cir. 1993). "Racketeering activity" is defined in 18 U.S.C. § 1961(1)(B) as any act "indictable" under certain enumerated federal criminal laws, including 18 U.S.C. § 1341 which makes mail fraud a criminal offense. *Id.* Pursuant to 18 U.S.C. § 1964(c), any person injured in his business or property by a violation of section 1962 may file suit in federal court to recover the damages he sustained. This permits the civil RICO action.

"A civil RICO action does not require that there be a prior criminal conviction for the conduct forming the predicate act; however, the conduct used to support a civil RICO action must be *indictable*." *Central Distributors*, 5 F.3d at 183. Thus, the plaintiff must prove each prong of the predicate offense. *Id.* at 183-84.

The Plaintiffs allege that the Defendants engaged in a pattern of racketeering activity by committing several acts of mail fraud. Thus, to maintain their RICO action, the Plaintiffs must show

7

that the Defendants committed each element of mail fraud. "To allege a violation of the mail fraud

statute, it is necessary to show that (1) the defendants formed a scheme or artifice to defraud; (2) the

defendants used the United States mails or caused a use of the United States mails in furtherance of

the scheme; and (3) the defendants did so with specific intent to deceive or defraud." *Id.* (quoting

*Schreiber Distributing Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1399-1400 (9th Cir. 1986)).

### H.     The Mail Fraud Schemes Alleged.

In their Amended Complaint, the Plaintiffs allege that the Defendants "have certified [as

DBEs] companies purporting to be owned and managed by minorities, although the defendants knew

that the companies were actually owned or managed by non-minorities, or that the companies could

not or did not perform the work. The defendants have also certified companies purporting to be

owned and managed by women as DBE's, although the defendants knew that the companies were

actually owned or managed by men or were otherwise ineligible for DBE certification." (Rec. No.

36, Amended Complaint ¶ 22).

In their response to the Defendants' prior motions for summary judgment, the Plaintiffs

alleged that the Defendants engaged in the seven mail fraud schemes described below.  In their

response to the Defendants' current motions for summary judgment, the Plaintiffs make clear that

they allege they were injured as a result of only the final two schemes described. (Rec. No.195 at 29).

"The other racketeering acts are submitted to the Court to show the pattern of the defendants' acts,

not because those particular acts caused injury to the plaintiffs."  (Rec. No. 195 at 29).

### 1)     The Scheme to Illegally Award DBE Subcontracts to Geco.

Plaintiffs allege that prime contractor Elmo Greer & Sons ("Greer") awarded multiple

subcontracts to Geco, a certified DBE, to perform work on federally-funded highway construction

8

projects.  Greer would pay Geco only 3 percent of the cost of the subcontract and then not require

Geco  to actually perform any work. (Rec. No. 159, Response at 10).

The Plaintiffs allege that the individual Defendants engaged in the following acts in carrying

out this scheme:

- Yowell personally approved all payments on each contract in which Greer used Geco as a subcontractor.  (Rec. No. 159, Response at 33)
- Codell and Yowell permitted Greer to send false certifications to the FHWA and Codell signed reports to the FHWA falsely stating the amount of DBE participation on federal highway projects.  (Rec. No. 159, Response at 33-34)[1].
- Codell and Yowell knew Geco was not performing the work required.  (Rec. No. 159, Response at 12, 34).
- Yowell thwarted efforts to investigate Greer and Geco and called Greer to tip him off that the fraud had been discovered.  (Rec. No. 159, Response at 12, 34).[2]
- Codell and Yowell continued to approve all of the Geco-Greer contracts.  (Rec. No. 159, Response at 13).
- Codell ordered a halt to Repasky's investigation after a draft report exposed the fraud, and prevented the draft report from being completed or officially disseminated. (Rec. No. 159, Response at 34)[3].
- Codell and Yowell took no action to decertify Geco. (Rec. No. 159, Response at 34).

**2)    The Scheme to Certify Contractors Corporation, Inc.**

Plaintiffs allege that the Defendants caused Contractors Corporation, Inc. ("Contractors

Corp.") to be certified as a DBE even though they knew it was only a "front" for Scotty's

---

[1] In support of these assertions, in their response to the Defendants' prior motions for summary judgment, the Plaintiffs cited Repasky's deposition at 89-90 and 90-91.  At pages 89-90, Repasky stated that, "[s]ince the Cabinet was counting commitments to use DBEs, instead of tracking what DBEs were actually being paid as required by the regulations, documents supplied to FHWA certified that the Cabinet's prime contractors were using DBE contractors to meet its goals, when in fact, the work was being performed by nonDBEs in violation of the law." At pages 90-91, Repasky states that these documents were provided to the FHWA by Derricks.

[2] In support of these assertions, in their response to the Defendants' prior motions for summary judgment, the Plaintiffs cited Yowell's deposition at pages 41 to 43 for the proposition that "Yowell called Greer to tip him off that his fraud had been discovered." (Rec. No. 159, Response at 12).  There, Yowell actually testified that he called Greer's president to tell him that Geco "needed to do the work as they had set forth." (Rec. No. 159, Response, Ex. 4, Yowell Depo. at 41).

[3] In their response to the Defendants' prior motions for summary judgment, the Plaintiffs cited no evidence in support of this allegation.

9

Contracting ("Scotty's), a major construction company. (Rec. No. 159, Response at 14). Contractors

Corp. was owned by the wives of the top executives at Scotty's. (Rec. No. 159, Response at 14).

The Plaintiffs allege that the individual Defendants engaged in the following acts in carrying

out this scheme:

- After OMA Executive Director Beckley notified Contractors Corp. that it did not qualify as a DBE, Yowell called Beckley to "vouch" for Contractors Corp. even though he knew the owners were married to the owners and executives of Scotty's Contracting. (Rec. No. 159, Response at 14, 35-36).
- Yowell and Codell knew that none of Contractors Corp.'s owners had sufficient experience to operate a construction company. (Rec. No. 159, Response at 36).
- Yowell requested that Beckley make a personal inspection of Contractors Corp. after OMA inspectors had recommended against certification. (Rec. No. 159, Response at 14, 35).
- When the Certification Committee rejected Contractors Corp's application, Codell overturned the decision.[4] (Rec. No. 159, Response at 15, 35).
- Yowell annually signed Contractors Corp.'s Certificate of Eligibility. (Rec. No. 159, Response at 15).
- Yowell personally approved payment on each contract on which Contractors Corp. was acting as a subcontractor. (Rec. No. 159, Response at 35).
- Yowell and Codell took no action to decertify Contractors Corp. (Rec. No. 159, Response at 36).[5]

### 3)    The Scheme to Certify ST Construction, LLC

Plaintiffs allege that the Defendants caused ST Construction, LLC, a company owned by Tina

Conner, to be certified as a DBE even though Conner and her husband had a net worth of $1.9

---

[4] In support of these assertions, in their response to the Defendants' prior motions for summary judgment, the Plaintiffs cited their Exhibit 14, an order signed by Codell stating that "[u]pon review of the recommendation of the Hearing Officer. . .IT IS HEREBY ORDERED that certification be issued to the Petitioner." Thus, it appears that Codell signed this order after a hearing was conducted and the hearing officer recommended certification.

[5] Todd Shipp, attorney for the Cabinet, testified that the fact that an applying company's owners are married to owners of another construction company does not by itself disqualify an applying company from being certified as a DBE. Instead, it raises a red flag. In Contractors Corp.'s case, Shipp testified that he did not believe that Derricks had compiled sufficient evidence that Contractors Corp. was not a legitimate DBE to ensure that the Cabinet would win a hearing challenging a decision to deny certification. Further, Contractors Corp. had produced evidence that it was legitimate and that it did quality work. Shipp testified that he, his boss and the deputy secretary therefore recommended certification to the Certification Committee. (Rec. No. 140, Mot. for Summ. J., Ex. 5, Shipp Dep. at 73-77).

10

million and were not, therefore, "disadvantaged." In addition, the company was to be managed by

Conner's husband. (Rec. No. 159, Response at 16).

     The Plaintiffs allege that the individual Defendants engaged in the following acts in carrying

out this scheme:

- Codell ordered Beckley and Derricks to meet with Connor. (Rec. No. 159, Response at 16, 37).
- Codell told Beckley, if we don't. . . get this done, the governor's going to have your head and mine." (Rec. No. 159, Response at 37 and Ex. 1, Beckley Dep. at 82-83).
- Codell pressured Beckley to approve Connor's revised application which stated a lower income within the DBE guidelines. (Rec. No. 159, Response at 17).

### 4)   The Scheme to Certify ProMark Construction, Inc.

     Plaintiffs allege that the Defendants caused ProMark Construction, Inc. ("ProMark") to be

certified as a DBE even though it was affiliated with Highway Markings, Inc., a company that

performed similar services and was not a DBE. (Rec. No. 159, Response at 18). ProMark's owners

were related to Highway Markings's owners. (Rec. No. 159, Response at 18).

     The Plaintiffs allege that the individual Defendants engaged in the following acts in carrying

out this scheme:

- Codell attended a meeting when ProMark "called out" Derricks for the delay in approving ProMark's certification. (Rec. No. 159, Response at 19).[6]
- Codell ordered Beckley and Todd Shipp, a Cabinet attorney, to meet with ProMark. (Rec. No. 159, Response at 19, 38).
- Codell took no action to decertify ProMark. (Rec. No. 159, Response at 38).

### 5)   The Scheme to Certify N.H. Stone, Inc.

Plaintiffs allege that the Defendants permitted N.H. Stone to remain certified as a DBE even

---

[6] In support of these assertions, in their response to the Defendants' prior motions for summary judgment, the Plaintiffs cited Exhibit 8, pages 99-101 of Derricks' deposition. Plaintiffs attached portions of Derricks' deposition at Exhibit 8 but pages 99-101 were not included.

though the net worth of its owner, Olivia Stone, exceeded the $750,000 limit. (Rec. No. 159, Response at 22-23).

The Plaintiffs allege that the individual Defendants engaged in the following acts in carrying out this scheme:

- the OMA staff told Yowell that Olivia Stone's net worth exceeded the limits but he did not inform anyone and did not investigate it. (Rec. No. 159, Response at 23).
- Codell read an article in which Olivia Stone stated that Fred Clark "bids the work and takes care of all that stuff" and that she only gets the mail, distributes it to the employees and signs the payroll checks, the bid bonds and the contracts. After reading the article, Codell took no action. (Rec. No. 159, Response at 24)
- In 2002, Derricks notified Codell of N.H. Stone's ineligibility on three grounds: excessive earnings, excessive net worth and lack of control by Olivia Stone. (Rec. No. 159, Response at 25).

**6)     The Scheme to Induce DBEs to Bid on the Shawnee Expressway Project.**

Plaintiffs allege that the Defendants represented to DBEs that the Shawnee Expressway Project offered "ample" or "many" opportunities for DBEs and encouraged them to submit bids on the project to prime contractors. The Cabinet set a six-percent DBE participation goal for the project which Plaintiffs contend was too low. The Cabinet awarded the prime contract to Kokosing Construction which purported to meet the DBE goal by awarding a subcontract to N.H. Stone. (Rec. No. 159, Response at 28-29).

The Plaintiffs allege that the individual Defendants engaged in the following acts in carrying out this scheme:

- Yowell sent a memo to all DBE Contractors announcing that the project may be the largest contract ever bid by the Cabinet and would offer many opportunities for those firms who wish to provide subcontract quotations. (Rec. No. 159, Response at 27).
- Yowell sent a letter to Kentucky Transfer's owner Maurice Sweeney that he had "made a personal commitment to [State] Senator Gerald Neal that the Cabinet would exert every effort in the recruitment of local firms for the construction of this multi-million dollar project." (Rec. No. 159, Response at 27).

12

- Codell set a 6% goal for DBE participation on the project. (Rec. No. 159, Response at 28-29).
- The Defendants approved the DBE participation plan submitted by Kokosing even though they knew that N.H. Stone was not qualified to be a DBE. (Rec. No. 159, Response at 29).
- Yowell offered Chaz a small, but illegal, set-aside project to pacify African-American contractors. (Rec. No. 159, Response at 29, 41)[7].

### 7)   The Scheme to award the Subcontract on the Kentucky Highway 431 Project to Contractors Corp. and N.H. Stone.

Scotty's was the prime contractor on a the Kentucky Highway 431 Project. Scotty's awarded Plaintiff Green River Seed a subcontract for the provision of guardrail, fencing, seed and sod but later terminated the subcontract. Scotty's then entered into a subcontract with Contractors Corp. for the provision of seed and sod on the project. (Rec. No. 159, Response at 10). After Green River complained to the OMA that Contractors Corp. was not a legitimate DBE, Scotty's entered into a subcontract with N.H. Stone as the DBE on the project. (Rec. No. 159, Response at 21).

The Plaintiffs allege that the individual Defendants engaged in the following acts in carrying out this scheme:

- the Defendants approved N.H. Stone as the DBE on the project, knowing that it was not a qualified DBE. (Rec. No. 159, Response at 21).
- Yowell met with Georgina Grant, CEO of Green River, and angrily defended Scotty's. (Rec. No. 159, Response at 22).

---

[7] In support of these assertions, in their response to the Defendants' prior motions for summary judgment, the Plaintiffs asserted the following: "[Yowell] knew the set aside was 'illegal,' but stated he was going to do it anyway. When asked whether he was serious due to the illegality of the proposal, Yowell reiterated his intentions to proceed and that because it was illegal, he would simply call it a 'pilot project.'" In support of this assertion, Plaintiffs cited Yowell's deposition at page 101.

There, Yowell actually testified that, "our rules and regulations as formulated by the Federal Highway Administration do not allow what I would call DBE set-asides where we can ascertain that the only bidders acceptable would be DBE companies, but what I was proposing would have been one where there was a near certainty that a DBE firm would do the work." When asked how that project would work, Yowell stated "contrary to our specifications, which at that time required a prime contractor to do 50 percent of the work on a project, that we would set that requirement, waive that, which was within my. . ." Plaintiffs did not submit the following page of Yowell's deposition containing the remainder of this discussion. (Rec. No. 159, Response, Ex. 4, Yowell's Dep. at 101).

- The Defendants have approved Scotty's awarding of subcontracts to Contractors Corp. on subsequent construction projects. (Rec. No. 159, Response at 22).
- Yowell permitted Green River to be removed from the project.(Rec. No. 159, Response at 39).
- Codell and Yowell approved the replacement of Contractors Corp. with N.H. Stone. (Rec. No. 159, Response at 39).
- Codell and Yowell approved the DBE re-certification of N.H. Stone in 2000 and 2002. (Rec. No. 159, Response at 39).
- The defendants knew N.H. Stone was not a legitimate DBE. (Rec. No. 159, Response at 39).

In addition to these schemes to defraud, the Plaintiffs also allege a larger scheme to defraud which encompasses these specific schemes. This larger scheme was the Defendants' scheme to induce individuals or companies to expend money to become certified as DBEs, to maintain their DBE certification and/or to bid on subcontracts despite the Defendants' knowledge that they were not administering the DBE program in compliance with the law. The fraudulent acts consisted of statements by the Defendants that the DBE Program was administered fairly and in compliance with federal and state regulations.

### I. Court's Prior Summary Judgment Ruling.

In its prior summary judgment ruling, relying on *Central Distributors*, this Court determined that, to establish standing in a civil RICO case relying on the predicate act of mail fraud, the plaintiff must show that the defendant made misrepresentations or omissions of material fact to the plaintiff and that the plaintiff relied on those misrepresentations or omissions to its detriment. *Central Distributors*, 5 F.3d at 183; *see also, Chaz Construction,* 137 Fed. Appx. at 738-39.

The Court determined that, with regard to the first five of the seven schemes alleged by the Plaintiff and described above – the alleged scheme to award subcontracts to the illegitimate Geco and the schemes to falsely certify Contractors Corp., ST Construction, ProMark and N.H. Stone –

14

the Plaintiffs had no standing to assert a claim based on these schemes. This is because the Plaintiffs did not allege that these schemes involved any representations from the Defendants to the Plaintiffs or any communications between the Defendants and Plaintiffs at all.

As to the alleged scheme to award the subcontract on the Kentucky Highway 431 Project to Contractors Corp. and N.H. Stone, the Court determined that the only communication that the Plaintiffs alleged occurred between the Plaintiffs and the Defendants was a meeting between Yowell and Green River's CEO in which Yowell "defended" Scotty's. The Court determined that, even assuming that this constitutes a false representation that Scotty's was acting honestly, there is no allegation that Green River took any action in reliance on this representation.

As to the seventh scheme – the scheme to entice DBEs to bid on the Shawnee Expressway Project – the Court determined that the Plaintiffs had produced sufficient evidence to withstand a motion for summary judgment that Chaz Concrete, Kentucky Transfer and Grant Trucking bid on the Shawnee Expressway project in reliance on Yowell's representations. The Court noted that Codell argued that there was no evidence that Grant Trucking actually bid on the project. The Court found it unnecessary to resolve this issue because the Plaintiffs had produced no evidence that the statements were false or that Yowell knew they were false.

As to the larger scheme of the Defendants to entice individuals and companies to enter into the DBE program, remain in the DBE program and/or bid on projects even though the Defendants knew the program was not being administered in compliance with the law, the Court noted that the Plaintiffs' claims are against two *individuals*. Thus, while it may be a given that the Plaintiffs believed that the DBE program was fairly run when they chose to participate in it, the Court determined that the Plaintiffs must point to specific statements by these individual Defendants that

15

induced the Plaintiffs to enter into the DBE program, maintain DBE certification and/or bid on projects. The Court determined that the Plaintiffs had produced no such evidence and, thus, had no standing to challenge the larger scheme.

Accordingly, the Court granted the Defendants' summary judgment. The Plaintiffs appealed that decision to the Sixth Circuit which remanded the action to this Court in light of the Supreme Court's decision in *Bridge*. The Defendants again move for summary judgment.

## II.     ANALYSIS.

### A.     Supreme Court's Decision in *Bridge*.

In *Bridge*, the Court determined that, a plaintiff asserting a civil RICO action predicated on mail fraud "need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." 128 S.Ct. at 2145.

That case involved a program by which Cook County, Illinois auctioned tax liens it held on property owned by delinquent taxpayers. *Id.* at 2135. The county awarded the liens to the bidders willing to accept the lowest penalty that the property owners had to pay to clear the lien. *Id.* Often, multiple bidders were willing to accept no penalty at all. *Id.* In such cases, the county awarded liens on a "rotational basis" to ensure that the liens were apportioned fairly among the bidders willing to accept no penalty. *Id.*

To prevent the bidders from manipulating the system to obtain more than their fair share of the liens, the county adopted a rule requiring that bidders submit bids in their own name and prohibiting them from submitting bids in the name of an agent acting on the bidders' behalf. *Id.* Bidders had to submit a sworn affidavit that they complied with the rule. *Id.*

The plaintiffs were bidders who filed suit against other bidders that they argued had violated

16

the rule, thereby depriving the plaintiffs of their fair share of the liens. *Id.* at 2136. The district court dismissed the claim for lack of standing because the plaintiffs were not the recipients of the alleged misrepresentations. *Id.* Instead, the misrepresentations were made to the county. *Id.* at 2138.

The Supreme Court determined that the plaintiffs were injured "by reason of" the defendants' violation of § 1962(c) and thus had a private right of action under RICO. *Id.* at 2138. The Court determined that a person can be injured "by reason of" a pattern of mail fraud even if he has not relied on *any* misrepresentations." *Id.* at 2139 (emphasis added).

**B.     Causation under RICO.**

After *Bridge*, the Sixth Circuit has stated that, while a plaintiff [in a civil action predicated on mail fraud "need not establish first-party reliance, she still must established that the alleged violation was the cause (both "but for" and proximate) of her injury." *Grange Mutual Casualty Co. v. Mack*, 290 Fed. Appx. 832, 835 (6th Cir. 2008)(citing *Bride*, 128 S.Ct. at 2141-42). "*Bridge* did not change the overall standard for proximate cause. A plaintiff must still show the "alleged violation led directly to the plaintiff's injuries."' *Grange*, 290 Fed. Appx. at 836 (quoting *Bridge*, 128 S.Ct. at 2142). "To establish proximate cause for a § 1962(c) violation, plaintiffs must allege that [the defendant's] own violations of § 1962(c) led directly to plaintiff's injuries." *Grange*, 290 Fed. Appx. at 835.

Most recently, the Supreme Court issued its decision in *Hemi Group, LLC v. New York*, – U.S. –, 130 S.Ct. 983 (2010). That case involved a city tax on those who possess cigarettes. *Id.* at 986. In-state sellers were required to collect the tax from purchasers and pay it to the city but out-of-state sellers were not *Id.* at 987. Instead, the city was responsible for recovering the tax directly from the purchasers. *Id.* The city required out-of-state sellers to register and file a report with the state

17

listing the name and address of the in-state purchasers. *Id.* The city used the report to track down cigarette buyers who had not paid their possession taxes.

The defendant in *Hemi* was an out-of-state cigarette seller who sold cigarettes to purchasers online but did not file the required reports with the state. *Id.* The city filed suit against the defendant, alleging that its failure to file the reports constituted the RICO predicate offense of mail fraud. *Id.* It asserted its injury was "lost tax revenues." *Id.* at 987-88. The Supreme Court determined that the city could not establish the causation required under RICO because it could not establish it had suffered the injury "by reason of" the alleged fraud as required by § 1964(c) *Id.* at 988.

The Court began by reiterating the standard of causation for a RICO claim set forth in *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258 (1992). In that case the Court held that a civil RICO plaintiff must show that the RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Id.* at 989 (quoting *Holmes*, 503 U.S. at 268). "Proximate cause for RICO purposes. . . should be evaluated in light of its common-law foundations; proximate cause thus requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* A link that is "too remote," "purely contingent," or "indirec[t]" is insufficient. *Id.* (quoting *Holmes*, 503 U.S. at 271, 274).

The Court noted that "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step," *id.* (quoting *Holmes*, 503 U.S. at 271-272) and this "applies with full force to proximate cause inquiries under RICO." *Id.* "[I]n the RICO context, the focus is on the directness of the relationship between the conduct and the harm," and not on foreseeability. *Id.* at 991.

The Court determined that "the conduct directly responsible for the City's harm was the

18

customers' failure to pay their taxes. And the conduct constituting the alleged fraud was [the defendant's] failure to file. . . reports." *Id.* at 990. Accordingly, "the conduct directly causing the harm was distinct from the conduct giving rise to the fraud." *Id.* The Court held that the plaintiff must show that the fraudulent conduct led directly to the plaintiff's injuries. *Id.* at 992. Because the city's injuries "were not caused directly by the alleged fraud," the injuries were not caused "by reason of" the fraud. Thus, the RICO claim failed. *Id.* at 994.

**C.     Causation Theories in this Case.**

In their current motions for summary judgment, the Defendants assert that the Plaintiffs cannot establish that the alleged RICO violations were the cause of any damages suffered by the Plaintiffs. As noted, "in the RICO context, the focus is on the directness of the relationship between the conduct and the harm," and not on foreseeability. *Hemi.*130 S.Ct. at 991. Thus, the Plaintiffs cannot meet their burden of showing that the Defendants' fraud caused the Plaintiffs' injuries by simply showing that "the concept of the injury was well known to the defendants" and, thus, foreseeable as the Plaintiffs argue in their response brief. (Rec. No. 195 at 26). Instead, the Plaintiffs must produce evidence of a direct relationship between their injuries and the fraud.

As stated, in their response, the Plaintiffs make clear that they are only attempting to prove that they were directly injured with regard to two of the seven specific mail fraud schemes alleged: the Shawnee Expressway Project and the Kentucky Highway 431 Project. With regard to these projects, the Plaintiffs assert that their injuries consist of "lost profits." (DE 195 at 28). The Plaintiffs also assert that they were injured by the larger scheme of the Defendants to entice companies to enter into the DBE program and bid on projects. With regard to this scheme, the Plaintiffs assert that their injuries consist of "reliance" injuries. (DE 195 at 28).

19

**1)      Lost Profits on the Shawnee Expressway Project.**

With regard to the Shawnee Expressway and Kentucky Highway 431 projects, the Plaintiffs

allege their lost profits derive from the Defendants' fraudulent acts in permitting just one particular

entity to remain certified as a DBE despite the fact that the Defendants knew that the entity was not

qualified. The Plaintiffs assert that subcontracts were awarded to N.H. Stone on these projects that

would have been awarded to the Plaintiffs if the Defendants had not permitted N.H. Stone to remain

certified.

With regard to the Shawnee Expressway Project, the Plaintiffs allege the following:

> It is undisputed that, if N.H. Stone had not been certified as a DBE, the winning
> bidder would have been required to find other, properly certified companies, to meet
> the 6% DBE Participation requirement. A jury could reasonably find that some or
> all of this DBE work. . . would have gone to plaintiffs Chaz Concrete, Kentucky
> Transport, and Grant Trucking.

(Rec. No. 195 at 27).

Thus, the fraudulent conduct alleged by the Plaintiffs is the illegitimate certification of N.H.

Stone as a DBE. The Plaintiffs may also allege that the fraudulent conduct was the Defendants'

approval of the DBE participation plan submitted by Kokosing, the prime contractor on the project,

which included subcontracts to N.H. Stone (Rec. No. 159 at 29). The alleged injury is the Plaintiffs'

lost profits from the Shawnee Expressway Project. To establish that the Defendants' fraudulent acts

caused their injuries, the Plaintiffs must establish a direct relationship between the Defendants'

certification of N.H Stone as a DBE and/or their approval of Kokosing's DBE participation plan and

the Plaintiffs' failure to receive a subcontract on the Shawnee Expressway Project. The Plaintiffs

cannot do this.

The conduct directly responsible for the Plaintiffs' lost profits was Kokosing's failure to

20

choose the Plaintiffs as a subcontractor on the project. Thus, as in *Hemi*, the "conduct directly causing the harm was distinct from the conduct giving rise to the fraud." *Hemi*, 130 S.Ct. at 990. Accordingly, the Plaintiffs cannot establish that the Defendants' RICO predicate offense caused their injury.

Any finding that the Plaintiffs should be entitled to lost profits from the project requires a prior finding that, if not for the Defendants' certification of N.H. Stone or approval of N.H. Stone as a subcontractor on the project, then Kokosing or any other prime contractor would have necessarily chosen the Plaintiffs as subcontractors. But, any such finding would be based only on speculation. There is no evidence in the record that could support such a finding. There is no evidence, for example, of the subcontracting requirements for the job, of any of the Plaintiffs' capabilities or of the capabilities of the other subcontractors that bid on the project, or of the content of the bids of each of the subcontractors.

Contrary to the Plaintiffs' argument, a jury could not infer from the mere fact that the Plaintiffs are certified DBEs that they would have necessarily been awarded subcontracts on the Shawnee Expressway Project if not for the existence of N.H. Stone as a DBE.

**2)      Green River's Lost Profits from the Kentucky Highway 431 Project.**

As to the Kentucky 431 project, the Plaintiff asserts that Green River was injured when it was removed from the project and the Plaintiffs further assert that it was the Defendants who removed Green River. Specifically, the Plaintiffs assert that the "defendants. . . attempted to remove Green River to install Contractors Corp." but "[w]hen that action appeared to blatant, the defendants instead used N.H. Stone." (DE 195 at 28). The Plaintiffs argue that a jury could reasonably find that the excuses for removing Green River were "pretextual." (DE 195 at 28).

21

An initial problem with this argument is that there is no evidence in the record that it was actually the *Defendants* who removed Green River from the project. In the "Facts" portion of their response, the Plaintiffs themselves state that Scotty's discharged Green River. (DE 195 at 18). There is no evidence that the Defendants caused that action.  The only evidence in the record is that Scotty's removed Green River from the project because Scotty's believed that Green River was in material breach of its subcontract with Scotty's. (DE 196, Ex. E).

The Plaintiffs may also allege that the fraudulent conduct that the Defendants undertook with regard to the Kentucky Highway 431 project was that they approved N.H. Stone to replace Green River, knowing that N.H. Stone was not a qualified DBE.  The alleged injury is Green River's lost profits from the project.  Thus, the Plaintiffs must establish a direct relationship between the approval of N.H. Stone to replace Green River and Green River's lost profits. The Plaintiffs cannot do this.

The conduct directly responsible for Green River's lost profits was Scotty's act of terminating its subcontract with Green River.  Thus, again as in *Hemi*, the "conduct directly causing the harm was distinct from the conduct giving rise to the fraud." *Hemi*, 130 S.Ct. at 990. Accordingly, the Plaintiffs cannot establish that the Defendants' RICO predicate offense caused their injury.

**3)      Reliance Injuries.**

Pursuant to *Bridge*, in a civil RICO action based on the predicate act of mail fraud, the Plaintiffs are not *required* to prove that they relied on the misrepresentations of the Plaintiffs. Nevertheless, to establish that the Defendants' actions caused their injuries, the Plaintiffs *may* submit evidence that they relied on the Defendants' misrepresentations. "Proof that the plaintiff relied on the defendant's misrepresentations may in some cases be sufficient to establish proximate cause, but

22

there is no sound reason to conclude that such proof is always necessary." *Bridge*, 128 U.S. at 2144.

In other words, plaintiffs can establish causation in a civil RICO action predicated on mail fraud with evidence that there was a mail fraud scheme in which misrepresentations were made and that the plaintiffs were directly injured by the scheme implemented by the defendants, even if they were not directly injured by the misrepresentations. Alternatively, plaintiffs may establish causation in a civil RICO action predicated on mail fraud with evidence that there was a mail fraud scheme in which misrepresentations were made and that the plaintiffs were directly injured by the misrepresentations.

In their response brief, the Plaintiffs assert both kinds of injuries. In addition to the "lost profit" injuries described above, the Plaintiffs assert what they call "reliance injury." (DE 195 at 28-29) They argue that they relied on the Defendants' statements that the DBE program would be run legitimately. They further argue that such reliance caused them to expend "time, money and effort to cause their business to become certified as DBEs and renew the certifications annually. Moreover, they spent money to pay for equipment, labor and financing to operate their companies as DBEs, and they spent time and labor to bid on the DBE projects." (DE 195 at 28).

While the Plaintiffs need not argue their injuries were caused by their reliance on the Defendants' false statements, if the Plaintiffs do make such an argument, then they must submit evidence of what those statements were and of their falsity.

As to the Plaintiffs other than Chaz, the Plaintiffs simply assert that "[t]he other plaintiffs have similar losses of capital from forming and operating their businesses." (DE 195 at 28). The Plaintiffs make no attempt to describe those losses and submit no evidence of them. Further, they make no attempt to describe the statements upon which these Plaintiffs relied. Accordingly, any

23

claim by the Grant Trucking, Kentucky Transfer or Green River that they detrimentally relied on any statements by the Defendants must fail.

As to Chaz, the Plaintiffs provide little more evidence of the statements upon which it relied or the injuries it suffered. They cite page 87 of Chaz President Berkley's deposition. (Rec. No. 195 at 28). There, when asked what Defendants Codell and Yowell personally misled Berkley into doing, Berkley testified, "they had told me before that whenever you get a job, they would lean more or less towards the company that had the higher percentage of participation." When asked specifically who stated that, Berkley responds, "Codell" and states that Codell made the statement in a meeting before Berkley started Chaz. (Rec. No. 151, Ex. 6 at 87).

The Court has reviewed other portions of Berkley's deposition contained in the record. In one portion, Berkley testified that, before he began Chaz, he met with Yowell and that Yowell told him that, in projects in rural counties, the Cabinet had trouble meeting their DBE goals. (DE 151, Ex. 6 at 32). Thus, for projects in Louisville, the Cabinet "hopefully can get up a higher percentage of DBE participation, you know, 15, 20, 30 percent. And obviously that offsets these counties where they can only get the 1 and 2 percent." (DE 151, Ex. 6 at 32).

The Plaintiffs present no evidence that these statements caused Berkley to undertake to have Chaz certified as a DBE. The Court has been unable to locate any testimony by Berkley in the portions of his deposition contained in the record that these statements caused him to certify Chaz as a DBE.

Further, neither Codell nor Yowell explicitly stated that Chaz would obtain subcontracts if it were certified as a DBE but instead made only vague statements that, in awarding prime contracts, the Cabinet would, "lean more or less," toward contractors that would award more work to DBEs

24

and that there would "hopefully" be higher DBE participation on Louisville projects than on rural projects. Because the statements are vague, there is no evidence from which a jury could conclude they are false. Further, because of the vagueness of the statements,  a jury could not find that any reliance on them by Chaz was reasonable.

Finally, even if Chaz could show that it reasonably relied on the Defendants' statements that they hoped for higher DBE participation and would, "lean more or less" to contractors that would fulfill that hope, Chaz has presented no evidence regarding the damages it incurred in applying for DBE certification or maintaining such certification.

Accordingly, any claim by Chaz that it undertook DBE certification or maintained DBE certification in reliance on these statements by the Defendants must be dismissed.

As to whether Chaz incurred expenses in bidding on DBE projects in reliance on the Defendants' statements, Chaz can only be making this argument with regard to the Shawnee Expressway Project.  In his deposition, Berkley testifies that the only project that Chaz bid on that he felt he should have been awarded but did not receive was the Shawnee Expressway Project. (Rec. No. 141, Ex. 3, Berkley Dep. at 17-18).

As to the statements upon which Chaz relied regarding this project, in its prior summary judgment ruling, the Court discussed a memorandum by Yowell addressed to "All Certified Disadvantaged Business Enterprise Contractors." (Rec. No. 159, Response, Ex. 41). In the memorandum, Yowell announces that the Cabinet will receive bids for the Shawnee Expressway Project. He further states that the project "will offer many opportunities for those firms who wish to provide subcontract quotations."

The Court also discussed Yowell's deposition in which he testified that he met with Berkley

25

because Berkley was "wanting to do work on the Shawnee Expressway." (Rec. No. 159, Ex. 4, Yowell Dep. at 97). Yowell recalled telling Berkley that "ample opportunities" would be forthcoming from the Shawnee Expressway Project for interested DBEs. Yowell testified that he was "really promoting the project." (Rec. No. 159, Ex. 4, Yowell Dep. at 97).

Again, however, as the Court stated in its prior summary judgment ruling, the problem with proving the falsity of these statements is that the statements are vague. Yowell represented that the Shawnee Expressway Project offered "many" or "ample" opportunities for DBEs. Yowell did not represent that the Shawnee Expressway Project would present an opportunity for DBEs to earn a specific amount. Nor did he represent that a certain number of DBEs would be hired to work on the Shawnee Expressway Project. Nor did he promise a specific percentage of the contract would be awarded to DBEs. Instead, he represented only that the project offered "ample" or "many" opportunities. Because these statements are indefinite, there is no evidence from which a jury conclude that they are false. Likewise, because of the vagueness of the statements, a jury could not conclude that Chaz's reliance on them was reasonable.

Furthermore, even if Chaz did reasonably rely on the statements and submitted a bid on the Shawnee Expressway Project, it has submitted no evidence regarding its damages in bidding on the project.

Accordingly, any claim by the Plaintiffs for "reliance" injuries, must be dismissed.

### III.   CONCLUSION.

For all these reasons, the Court hereby ORDERS that the Defendants' Motions for Summary Judgment (DE 191 and 193) are GRANTED; the Plaintiffs' Complaint is DISMISSED; and this matter is STRICKEN from the active docket of this Court.

26



Signed By:
Karen K. Caldwell
United States District Judge
3/29/10